**UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

---

Rembrandt Enterprises, Inc.,

                    Plaintiff,

v.

Illinois Union Insurance Company,

                    Defendant.

Civ. No. 15-2913 (RHK/HB)
**MEMORANDUM OPINION
AND ORDER**

---

Matthew R. Veenstra, Alain M. Baudry, Kutak Rock LLP, Minneapolis, Minnesota, Harry N. Niska, Ross & Orenstein LLC, Minneapolis, Minnesota, for Plaintiff.

Joseph A. Ziemianski, Cozen O'Connor, Houston, Texas, Stacey A. Broman, Meagher & Geer, PLLP, Minneapolis, Minnesota, for Defendant.

---

## INTRODUCTION

In this action, Plaintiff Rembrandt Enterprises, Inc. ("Rembrandt") has sued its insurer, Defendant Illinois Union Insurance Company ("Illinois Union"), to recover losses stemming from an outbreak of highly pathogenic avian influenza ("HPAI," commonly referred to as "bird flu"). Presently before the Court is Illinois Union's Motion for Partial Summary Judgment. For the reasons that follow, the Motion will be granted in part and denied in part.

## BACKGROUND

Rembrandt owns and operates commercial poultry farms in several states, including Minnesota and Iowa. In 2011, it purchased a Premises Pollution Liability Insurance Policy ("the Policy") from Illinois Union. The Policy insured Rembrandt's

farms against losses caused by a "pollution condition," that is, "[t]he discharge, dispersal, release, escape, migration or seepage of any . . . irritant, contaminant, or pollutant . . . on, in, into, or upon [covered] land and structures." It also provided "remediation" coverage for costs incurred responding to a "pollution condition," specifically, "reasonable expenses required to restore, repair or replace real or personal property to substantially the same condition it was in prior to being damaged during the course of responding to a 'pollution condition.'"

The Policy was in effect when bird flu was first discovered in the United States in 2014. The virus spread and, eventually, reached Rembrandt's farms in Rembrandt, Iowa, and Renville, Minnesota, in late April and early May 2015. The flu was particularly virulent: at the Renville farm, for example, 711 hens died on Tuesday, May 12, 2015, but the number steadily increased to more than 132,000 hens on Thursday, May 21 alone.[1] According to charts prepared by Rembrandt, it expected that more than a million hens in Renville would perish from the flu in the following week, which would leave only approximately 500,000 alive in a facility that originally housed more than 2 million. Indeed, Tom Seigfreid, Rembrandt's Vice President of Operations and its Rule 30(b)(6) designee, testified that despite Rembrandt's efforts to contain the infection, it expected that all of the birds at the affected facilities would eventually die.[2]

---

[1] Similar mortality was experienced at the Rembrandt, Iowa farm.

[2] Rembrandt argues that Seigfreid offered "off-the-cuff speculation" and it is a fact question whether its entire flock was fated to die. (Mem. in Opp'n at 11.) But even accepting Seigfreid's testimony at face value, it does not change the outcome.

Before that happened, however, federal and state regulators ordered Rembrandt to quarantine its facilities and euthanize all of its birds at these locations, to help contain spread of the virus. Because there were millions of birds at each facility, the "depopulation" and cleanup took several months; indeed, Rembrandt euthanized more than 1.9 million birds at its Rembrandt farm alone. Once this process was complete, it purchased new chicks to "repopulate" its facilities, spending more than $21 million to do so. Repopulation efforts were finally completed in January 2017.

As a result of the foregoing, Rembrandt submitted a claim to Illinois Union for the Policy's entire $7 million limit: $5 million for business interruption losses and $2 million for remediation expenses. Illinois Union denied coverage, and Rembrandt then commenced this action. The parties agreed to bifurcate the matter, addressing liability first and damages second, and later cross-moved for summary judgment as to liability. On January 12, 2017, the Court denied those Motions, concluding there were genuine issues whether (1) bird flu had "dispersed, released, migrated, or seeped" onto or into Rembrandt's facilities, a prerequisite to coverage, and (2) the flu had spread due to human activity, which would trigger an exclusion in the Policy. (See Doc. No. 146.)

The parties then undertook damages discovery. With that discovery complete, Illinois Union now moves for partial summary judgment, arguing Rembrandt cannot recover the $2 million it seeks for remediation costs. Its Motion has been fully briefed, the Court heard argument on August 25, 2017, and the Motion is ripe for disposition.

## STANDARD OF REVIEW

Summary judgment is proper if, drawing all reasonable inferences in favor of Rembrandt, no genuine issue of material fact exists and Illinois Union is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Illinois Union bears the burden of showing the material facts in the case are undisputed. Id. at 322; Johnson v. Wheeling Mach. Prod., 779 F.3d 514, 517 (8th Cir. 2015). The Court must view the evidence, and the inferences that may reasonably be drawn from it, in the light most favorable to Rembrandt. Ryan v. Armstrong, 850 F.3d 419, 424 (8th Cir. 2017); Letterman v. Does, 789 F.3d 856, 858, 861 (8th Cir. 2015). Rembrandt may not rest on allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Nationwide Prop. & Cas. Ins. Co. v. Faircloth, 845 F.3d 378, 382 (8th Cir. 2016).

## ANALYSIS

Although Rembrandt incurred significant expenses in connection with the forced euthanization of its flocks – such as disposal of carcasses and disinfecting its facilities – it seeks to recover only two types of expenses under the Policy's provision for "remediation costs": (1) money spent acquiring chicks to replace euthanized birds, in order to repopulate its flocks, and (2) money spent to heat its barns once the flocks had been depopulated. For the reasons that follow, the Court concludes repopulation expenses are reimbursable, but heating expenses are not.

## I. Repopulation

The Policy defines the term "remediation costs" as "reasonable expenses required to restore, repair or replace real or personal property to substantially the same condition it was in prior to being damaged during the course of responding to a pollution condition." Under New York law,[3] the Court must interpret this language according to its plain and ordinary meaning. E.g., Fed. Ins. Co. v. Int'l Bus. Mach. Corp., 965 N.E.2d 934, 936 (N.Y. 2012). Illinois Union does not dispute that the birds euthanized by Rembrandt were "personal property" or that it incurred expenses to "replace" that property by buying new chicks. Nor does it dispute that Rembrandt's farms were impacted by a "pollution condition." Rather, the crux of its argument is that Rembrandt's birds were not "damaged *during the course of* responding to a pollution condition." According to the insurer, Rembrandt's birds were damaged *by* a pollution condition – bird flu – and not by the *response* to that infection. It argues the Policy is not "a livestock indemnity policy [and] does not provide replacement cost coverage for the death of livestock from disease." (Def. Mem. at 17.) Because all of Rembrandt's birds were going to die from bird flu, Illinois Union argues "[t]he damage . . . was complete the moment the flock became infected," and Rembrandt's *response* to the infection "was irrelevant": "A hen that will die imminently cannot be damaged any more than it is already damaged." (Id.)[4]

---

[3] The Policy contains a New York choice-of-law clause. (See Doc. No. 21 at 2.)

[4] The parties devote much of their briefs to arguing about the appropriate way to interpret the phrase "damaged during the course of responding to a pollution condition." According to Rembrandt, the word "during" is temporal, meaning any damage to the birds (no matter the cause) *while* Rembrandt was responding to bird flu is covered. Illinois Union, by contrast,

Though creative, there are two key problems with Illinois Union's argument. First, the insurer paints with too broad a brush when asserting that the precise moment one bird contracted flu, Rembrandt's entire flock was rendered "damaged." Although the record is somewhat murky on the issue, it appears undisputed that at least *some* of Rembrandt's birds were *not* infected with HPAI when government officials ordered – and Rembrandt completed – the entire flock's euthanization. Indeed, Rembrandt predicted that more than 500,000 birds in Renville would remain alive by the end of May. Given the virulence of the infection, this suggests that at least some of the birds were not sickened with bird flu at that time. The fact that some of these healthy birds may have later become infected (and hence, by Illinois Union's logic, "damaged") does not alter the fact that at the time they were euthanized, they were not sick. The destruction of these healthy birds squarely falls within the Policy's provisions for "property . . . damaged during the course of responding to a pollution condition."

Second, and as Rembrandt correctly notes, the Policy's definition of "remediation costs" does not require property to be in "pristine" condition before being damaged "during the course of responding to a pollution condition." Indeed, this is precisely why the Policy provides remediation costs will be reimbursed only to the extent necessary to put damaged property in "*substantially the same condition it was in prior to being damaged.*" (emphasis added). The Policy therefore contemplates that property might not

---

argues the word "during" suggests a sequence of events, such that the phrase can only be interpreted to apply to damage *caused by* Rembrandt's response to bird flu. Ultimately, this dispute is irrelevant, because even under Illinois Union's narrower interpretation of the Policy, repopulation expenses are recoverable.

be in perfect shape when damaged during pollution control or remediation, and hence even sickened birds could actually be "damaged" by being killed.  By Illinois Union's logic, the moment bird flu touched Rembrandt's facilities, all of its birds were immediately rendered valueless and could not be further damaged, but it offers no justification – and points to no evidence – for that conclusion.

Illinois Union also argues that Rembrandt's repopulation expenses cannot be labeled "remediation costs" because it replaces birds on a cyclical basis as part of its normal business operations.  In other words, it argues Rembrandt did not incur "any *additional* expenses – above and beyond [its] normal expenses – to replace its [egg-]lay[ing] hens," and thus a finding of coverage would result in a windfall for Rembrandt.  (Def. Mem. at 20 (emphasis in original).)  But this argument ignores that Rembrandt had to significantly expedite its replacement cycle due to the forced euthanization, replacing some birds almost twice as rapidly as normal.  (Mem. in Opp'n at 15.)  As Rembrandt notes, there was nothing "normal" about having to euthanize its entire flock:  "had there been no outbreak, Rembrandt would not have needed to 'replace' the hens at all."  (Id.)

Illinois Union's argument also ignores the Policy's definition of "remediation costs," which says nothing about property that would eventually be replaced; the only question is whether the property was "damaged during the course of responding to a pollution condition."  As already noted, the remediation-cost provision expressly contemplates that property might be in one condition when initially put to use but in a different condition when damaged later, suggesting it is intended to apply to property someday requiring replacement.  Taken to its logical conclusion, Illinois Union's

be in perfect shape when damaged during pollution control or remediation, and hence even sickened birds could actually be "damaged" by being killed.  By Illinois Union's logic, the moment bird flu touched Rembrandt's facilities, all of its birds were immediately rendered valueless and could not be further damaged, but it offers no justification – and points to no evidence – for that conclusion.

Illinois Union also argues that Rembrandt's repopulation expenses cannot be labeled "remediation costs" because it replaces birds on a cyclical basis as part of its normal business operations.  In other words, it argues Rembrandt did not incur "any *additional* expenses – above and beyond [its] normal expenses – to replace its [egg-]lay[ing] hens," and thus a finding of coverage would result in a windfall for Rembrandt.  (Def. Mem. at 20 (emphasis in original).)  But this argument ignores that Rembrandt had to significantly expedite its replacement cycle due to the forced euthanization, replacing some birds almost twice as rapidly as normal.  (Mem. in Opp'n at 15.)  As Rembrandt notes, there was nothing "normal" about having to euthanize its entire flock:  "had there been no outbreak, Rembrandt would not have needed to 'replace' the hens at all."  (Id.)

Illinois Union's argument also ignores the Policy's definition of "remediation costs," which says nothing about property that would eventually be replaced; the only question is whether the property was "damaged during the course of responding to a pollution condition."  As already noted, the remediation-cost provision expressly contemplates that property might be in one condition when initially put to use but in a different condition when damaged later, suggesting it is intended to apply to property someday requiring replacement.  Taken to its logical conclusion, Illinois Union's

argument would mean that costs incurred replacing *any* damaged property that might have eventually required replacement (through wear and tear, depreciation, obsolescence, or other reason) would never qualify as "remediation costs." If Illinois Union had wanted the term to have such a limited meaning, it could have (and should have) said so. See also, e.g., Thomas J. Lipton, Inc. v. Liberty Mut. Ins. Co., 314 N.E.2d 37, 39 (N.Y. 1974) (court should not interpret policy provisions so as to "render the coverage nearly illusory").[5]

For these reasons, the Court concludes Illinois Union is not entitled to summary judgment on Rembrandt's claim for repopulation expenses.

## II. Heating expenses

Because Rembrandt's barns hold hundreds of thousands of birds, typically they are not heated during winter, as the birds emanate enough heat to "keep[] the ambient temperature . . . above 50 degrees." (Mem. in Opp'n at 3.) Once the flocks were euthanized, however, this heat source disappeared. Accordingly, Rembrandt spent more than $800,000 to heat its barns until the flocks were repopulated, so that they "would not incur damage" in the interim. (Id.) Illinois Union argues these heating expenses are not covered under the Policy's provision for "remediation costs," and the Court agrees.

As with repopulation expenses, the Court's analysis begins and ends with the Policy's text. "Remediation costs," once again, are "reasonable expenses required to

---

[5] Illinois Union points out that the United States Department of Agriculture indemnified Rembrandt – to the tune of more than $15 million – for hens it was required to euthanize. Yet, it stops short of arguing this payment undermines Rembrandt's claim for repopulation expenses. (See Reply at 14 n.22 (noting that the Department of Agriculture's payment "is not relevant for the purposes of this motion" and was simply "provided as context").)

restore, repair or replace real or personal property to substantially the same condition it was in prior to being damaged during the course of responding to a pollution condition." And once again, the key phrase is "damaged during the course of responding to a pollution condition," in particular the word "damaged." There is nothing in the record here suggesting that Rembrandt's *barns* sustained any damage during the bird-flu crisis. While the birds *contained* in the barns may have been damaged, there is no indication that euthanizing the flock imparted any damage to the barns themselves. And if the barns did not sustain damage, remediation-cost coverage simply cannot apply to the heating expenses.

Rembrandt argues that because the birds were the barns' "working heat source," loss of the flock "damaged" them, requiring heat to "restore [them] to their pre-HPAI, heated condition." (Mem. in Opp'n at 16-17.) In the Court's view, however, Rembrandt asks the Court to cross a bridge too far by conflating the barns with the birds inside: it is the birds that sustained the damage, not the buildings housing them. Indeed, Rembrandt has repeatedly acknowledged that the heating costs were incurred not to *repair* any damage, but rather to *prevent* damage, to the barns. (See, e.g., id. at 17 (loss of birds "expos[ed] [the barns] *to the risk* that frost penetration underneath the floors would cause heaving that would damage the buildings and the equipment housed within") (emphasis added); Seigfreid Decl. (Doc. No. 103) ¶ 4 ("Rembrandt incurred significant costs . . . heating the [] barns *to prevent damage and deterioration of these barns* during repopulation.") (emphasis added).)

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Illinois Union's Motion for Partial Summary Judgment (Doc. No. 156) is **GRANTED IN PART** and **DENIED IN PART**.  The Motion is **GRANTED** with respect to Rembrandt's claim for heating expenses, and any claim to recover those expenses as "remediation costs" is **DISMISSED WITH PREJUDICE**.  In all other respects, Illinois Union's Motion is **DENIED**.

Date:  September 12, 2017

s/Paul A. Magnuson
PAUL A. MAGNUSON
United States District Judge